37 P.3d 1121 (2001)
2001 UT 106
PRESS PUBLISHING, LTD., Plaintiff and Appellant,
v.
MATOL BOTANICAL INTERNATIONAL, LTD., et al., Defendants and Appellees.
No. 990136.
Supreme Court of Utah.
December 14, 2001.
*1122 R. Brent Stephens, David T. Aagard, Salt Lake City, for plaintiff.
James S. Jardine, Craig Carlile, John W. Mackay, Provo, Randall L. Skanchy, Ross I. Romero, Salt Lake City, for defendants.
DURHAM, Justice:
¶ 1 Plaintiff Press Publishing Ltd. (Press) entered into numerous contracts with Matol Botanical International Ltd. (MBI) for the provision of printing services. After disputes arose between the parties, MBI sued Press for breach of contract. Press counterclaimed, alleging that defendants misappropriated its creative work. Eventually, MBI voluntarily withdrew its claims and defendants sought summary judgment on Press's counterclaims. The district court ruled in defendants' favor and this appeal followed.

*1123 BACKGROUND
¶ 2 The facts in this case are undisputed. MBI was a Canadian company that sold health supplements worldwide through independent distributors. As part of its operation, MBI prepared and provided promotional brochures and sales materials to its distributors. MBI's policy required these promotional materials to be authorized, prepared and printed under its supervision. From 1986 to 1989, Press provided printing services to MBI. To set forth the terms of each job, Press used a job authorization form (JAF). All first time customers were required to sign a JAF; subsequent JAFs did not need to be signed. The JAF contained eighteen terms and conditions on the reverse side. Paragraphs four and six expressly provided that any creative work and all preparatory materials developed and furnished by Press would remain its exclusive property, "except upon compensation" or "otherwise agreed in writing." Relying on approximately 250 JAFs, Press claims it created and/or modified numerous MBI promotional materials, such as logos, business cards, manuals, job applications, brochures, magazines and video tape covers.[1]
¶ 3 In 1989, Sam Kalenuik, Robert Bolduc, and Anthony Jurak, MBI's owners, hired Press's director of marketing and operations, Kevin Olsen, to form a new entity, Matol Communications Corporation (MCC), to supply all of MBI's future printing services. To facilitate Olsen's transition, MBI and Press entered into a number of agreements[2] (transition agreements). However, MCC soon notified Press that it had terminated the transition agreements because they were executory and not supported by consideration. Thereafter, Press filed a counterclaim setting forth numerous causes of action in this lawsuit, which had originally been filed by MBI for breach of contract claims.[3] All of Press's claims were based on the premise that (1) Kalenuik, Bolduc, and Jurak operated all of the Matol entities as a partnership, thereby "mak[ing] all [of them as] defendants liable [for] each other's acts," and (2) they conspired with Olsen to improperly obtain Press's proprietary property and destroy Press by foreclosing it from doing any business with MBI entities or distributors.
¶ 4 In November 1994, after conducting extensive discovery, defendants Olsen and Garrett, along with the Matol entities, filed a motion for partial summary judgment (first motion for summary judgment)[4] pertaining to the claims made in Press's third amended counterclaim, except with respect to breach of fiduciary duty. The motion was joined by defendants Bolduc, Kalenuik and Jurak. MBI argued, in part, that the claims for misappropriation of trade secrets and protectable proprietary property failed because: the materials produced by Press were neither secret nor creative work; MBI was only bound by the JAFs it had signed; the transition agreements were overly broad, void for lack of consideration, or only binding against Olsen; and Press had failed to show unfair competition, wrongful interference or anti-trust *1124 injuries. The crux of Press's response was that "the Defendants concocted this scheme to destroy Press and, acting in concert and as agents and alter egos of one another . . . carried out their plan." Press's position was that "there was no distinctness between any of the Defendants . . . they are all obligated jointly and severally for each of the [eighteen] causes of action." After hearings in December 1994 and January 1995, the court took the matter under advisement,[5] requesting supplemental briefs regarding the applicability of the Uniform Commercial Code to Press's JAFs.
¶ 5 Prior to the issuance of a ruling from the trial court, in March 1995, MBI commenced a C-36 bankruptcy reorganization proceeding in the Superior Court of the Province of Quebec in the District of Montreal, Canada (the C-36 Court).[6] Three months later, an involuntary bankruptcy proceeding was filed against MBI in the United States Bankruptcy Court in the District of Nevada (Bankruptcy Court).[7] In July 1995, the trial court below entered an order extending comity to the C-36 proceeding and staying this litigation against all defendants. However, the Bankruptcy Court granted Press limited relief from the automatic stay in this case to allow it to complete discovery and litigate pending motions.
¶ 6 In addition, the Bankruptcy Court ordered the trustee to negotiate a protocol, subject to court approval, with the C-36 interim manager to coordinate the reorganization procedures between the two bankruptcy cases.[8] The trustee and the interim manager executed a Protocol Re Obligations of Interim Manager and U.S. Trustee (the Protocol) in November 1995. Application for approval of the Protocol was served on all creditors, including Press, and the Protocol was approved by both the Bankruptcy Court and the C-36 Court. Once the Protocol was approved, the Bankruptcy Court anticipated that the C-36 Plan of Arrangement would "become binding on the creditor classes and other parties in interest including, but not limited to shareholders, officers, directors, coordinators and managing agents of MBI."
¶ 7 The Protocol set up procedures to allow the Canadian and American courts to work together to produce a joint outcome. With respect to the procedures for handling claims, section three of the Protocol provided in relevant part that (1) claims filed with either country would be deemed filed in both courts; (2) claims over $50,000, as well as disputed claims, were to be adjudicated in the C-36 proceeding; and (3) claims determined in the C-36 proceeding would be recognized in the Bankruptcy Court.
¶ 8 On February 6, 1996, the district court issued a ruling with respect to MBI's first motion for summary judgment. The court found that (1) the transition agreements were binding only as to Olsen, dismissing claims one, three and four as to all other defendants; (2) the JAFs were predominantly *1125 contracts for personal services, not subject to the Uniform Commercial Code, dismissing the sixth claim; and (3) Press had not created or sufficiently modified the items in question in order to support a misappropriation claim. The district court, however, did not sign an order regarding this ruling until June 2, 1998.
¶ 9 Shortly after the lower court's ruling on the first motion for summary judgment, on February 22, 1996, Press filed a timely notice of claim for $3,250,000 in the Bankruptcy Court; it cited the entire record of this case, including the fourth amended counterclaim, the briefs on summary judgment, and the hearing transcripts, as evidence. A few months later, the C-36 Court approved MBI's Third Plan of Arrangement. This plan specifically provided notice to creditors regarding the filing of proof of claims, the procedures for determination of claims, and the procedures for accepting or disallowing claims, including appeal of disallowed claims. Press vigorously opposed approval of the Third Plan of Arrangement, arguing that the C-36 proceeding would be unfair and prejudicial and requesting instead that its claims be determined in the Bankruptcy Court.
¶ 10 In response, in May 1996, MBI filed with the Bankruptcy Court a Motion to Convert Case to Ancillary Proceeding Pursuant to 11 U.S.C. Section 304[9] (Motion to Convert). In its motion, MBI asked the Bankruptcy Court to ratify the plan of arrangement approved by the C-36 Court, provide for the implementation of the plan in the United States, discharge all debts except as provided by the plan of arrangement, and permanently enjoin creditors from enforcing their claims outside the Third Plan of Arrangement. Press opposed the conversion, asking the Bankruptcy Court to refuse to enjoin this action and to retain jurisdiction over its proof of claim. Specifically, Press argued that (1) because the Utah proceeding had progressed significantly, it should be allowed to proceed; (2) "the claims against the defendants in the Utah civil action are inextricably intertwined" and there would be undue expense and delay if it were required to relitigate its claims in the C-36 proceeding, resulting in "prejudice and inconvenience" as contemplated in 11 U.S.C 304(c); and (3) it had not received notice of the Protocol and therefore had been prejudiced.[10] At the hearing on August 6, 1996, the Bankruptcy Court, relying on principles of comity, granted MBI's Motion to Convert and approved the Third Plan of Arrangement, but took under advisement MBI's request to enjoin Press's Utah action.
¶ 11 Also on August 6, 1996, the C-36 interim manager served Press with a "notice of disallowance" regarding all claims against all defendants. The interim manager cited twelve specific grounds for disallowance, which are summarized as follows:
(1) Press has no claim for trade secrets or proprietary information because
(a) the claimed information or material is generally known and is not secret,
(b) the information is otherwise not legally protected and/or is not proprietary, and
(c) the claimed information and material was developed for and sold to MBI, which paid the full purchase price; therefore, MBI is the owner of the claimed information and material.
(2) Press has no contractual claim as to the transition agreements because
(a) any claimed contract cannot make secret that which is not secret,
(b) the claimed contracts lack consideration,
(c) the claimed contracts are overly broad and unenforceable,
(d) the claimed contracts were properly terminated, and
(e) MBI is not a party to the claimed contracts.

*1126 (3) Press has no contractual claim with respect to the JAFs because
(a) the work performed or material or information provided by Press was paid for by MBI, and therefore, is owned by MBI, and
(b) the work performed or material provided does not constitute creative work or otherwise fit the definitions set forth in the claimed Job Authorization Form.
(4) Press has no claim for antitrust or unfair competition as no antitrust injury exists, there was no conspiracy, and MBI's actions were not unreasonable.
(5) Press has no claim for interference with existing or potential business, or with contracts, because MBI acted properly, was motivated by legitimate business interests, and did not interfere.
The notice of disallowance specified that pursuant to section 6.7 of the Third Plan of Arrangement, Press could "appeal such decision within 10-days following the day on which notice is received . . . failing which the creditor shall be deemed to have accepted the [interim manager's] decision for all purposes."
¶ 12 Apparently, Press did not receive this notice until after the time to appeal had run. Therefore, on October 8, 1996, it filed a motion asking the Bankruptcy Court to declare the disallowance objectionable under rule 3007 of the Federal Rules of Bankruptcy Procedure. Press argued that because the notice of disallowance had been issued three hours after the Bankruptcy Court had taken under advisement MBI's request to enjoin Press's Utah action, the notice of disallowance was an attempt to moot the Bankruptcy Court's decision. According to Press, "[t]his maneuver evidences the unfair and prejudicial treatment Press will receive in Canada if this Court enjoins Press'[s] Utah State Court action and/or does not retain jurisdiction of Press'[s] . . . claim." The Bankruptcy Court denied Press's request and granted MBI injunctive relief. However, due to the court's concern with the late notice, it specified in its ruling that MBI's injunctive relief was conditioned upon MBI's agreement to
waive the effect of Press Publishing's failure to timely convert the August 6, 1996 Notice of Disallowance . . ., and . . . reserve any Notice of Disallowance of Claim . . . no earlier than thirty days subsequent to the entry of this Order, granting [Press] a new ten day time period to contest such disallowance before the Canadian Court.
Accordingly, on December 27, 1996 a second notice of disallowance was served on Press. Press failed to appeal in the C-36 proceeding. Instead, it appealed the decision of the Bankruptcy Court to the United States District Court for the District of Nevada, arguing that the Bankruptcy Court erred in approving the Third Plan of Arrangement and in granting injunctive relief.
¶ 13 In April 1997, defendants filed a motion for summary judgment (second motion for summary judgment) in this case seeking to have the remaining claims in this action dismissed under the doctrine of res judicata. They argued that because they were privies of MBI and Press's claims were raised in the C-36 proceeding, the notice of disallowance in the C-36 proceeding constituted a judgment on the merits barring the adjudication of the remaining claims in this action. In response, Press argued for the first time that the remaining defendants were not alter egos of MBI, but were independently liable for the remaining claims.
¶ 14 In February 1998, the United States District Court affirmed the decision of the Bankruptcy Court, holding that the latter had full authority to approve the plan and to authorize injunctive relief, and concluding that the plan provided a just and fair mechanism to file and adjudicate "all claims, including Press's unliquidated claim." A month later, on March 19, the trial court issued an order with respect to the remainder of MBI's first motion for summary judgment. The court concluded that Press failed to meet its burden of proof and granted MBI's motion regarding the tenth, eleventh, thirteenth, fourteenth, fifteenth and eighteenth causes of action. With respect to the seventeenth claim, the court ordered MBI to provide Press with an accounting dating back to June 30, 1989.[11]
*1127 ¶ 15 Eight months later, on November 17, 1998, the trial court issued a memorandum decision granting MBI's second motion for summary judgment, ruling that the pending claims were barred under the claim preclusion branch of res judicata. An order to this effect was signed on January 7, 1999. The court concluded that defendants were privies of MBI, that Press's remaining claims had been presented in the C-36 proceeding, and that there had been a final judgment on the merits. The court reasoned that, "many of the Defendants are officers and employees of MBI, [who] were involved in actually and openly defending the bankruptcy proceeding, thereby becoming privies under the Sea[r]le rationale." In addition, the court noted that Press had failed to show how the remaining defendants were independently liable, especially in light of the fact that "[t]hroughout this case [Press] has argued that Defendants are alter egos of one another. . . ." Next, the court held that because Press had filed a notice of claim in the Bankruptcy Court, proffering the entire record in this case as its evidence, it had raised all its claims in this action in the C-36 proceeding pursuant to the Protocol. The trial court also concluded that the claims against defendants in this case stem from the same actions as the claims against MBI in the C-36 proceeding. Finally, the court ruled that the results of the C-36 proceeding constituted a final judgment on the merits, citing as authority Copper State Thrift & Loan v. Bruno, 735 P.2d 387, 390 (Utah Ct.App.1987) (holding that an arrangement confirmed by a bankruptcy court is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition). The court specifically mentioned in its ruling that "it was [Press's] failure to appeal the notice of disallowance that determined that the [interim manager's] decision would be the final decision of the Canadian Court."
¶ 16 Press now appeals the entire January 7, 1999 order, and the portion of the order dated January 2, 1998 which limited its breach of contract claims. All parties agree that Press's claims against MBI are barred.

ANALYSIS
¶ 17 The two issues before the court on appeal are whether the district court erred in concluding that Press's claims against the remaining defendants are barred under the doctrine of res judicata and in dismissing Press's claim for breach of contract with respect to the JAFs.

I. CLAIM PRECLUSION
¶ 18 Press claims the district court erred in concluding that its remaining causes of action are barred by the claim preclusion branch of res judicata. According to Press, the requirements for claim preclusion have not been met. First, Press argues it is not precluded from claiming defendants are not MBI's privies. Next, Press argues that ten of the claims set forth in this action involve acts not directly involving MBI. Finally, Press claims the district court erred in concluding that the notice of disallowance in the C-36 proceeding constituted litigation of all the claims on the merits because (1) the claims were not litigated before a court, (2) the C-36 Court lacked jurisdiction to review its claims, and (3) the Third Plan of Arrangement did not "litigate" a contract between MBI and its creditors.
¶ 19 The ultimate "determination of whether res judicata bars an action is a question of law, . . . [which] we . . . review. . . for correctness." Macris & Assocs. v. Neways, 2000 UT 93, ¶ 17, 16 P.3d 1214. We have outlined the law relating to the doctrine of res judicata as follows:
The doctrine of res judicata embraces two distinct branches: claim preclusion and issue preclusion. Claim preclusion involves the same parties or their privies and also the same cause of action, `and this precludes the relitigation of all issues that could have been litigated as well as those that were, in fact, litigated in the prior action.' Issue preclusion [also known as collateral estoppel], on the other hand, `arises from a different cause of action and prevents parties or their privies from relitigating facts and issues in a second suit that were fully litigated in the first suit.'(Citation omitted). Therefore, . . . different rules govern each branch.
*1128 Id. at ¶ 19, 16 P.3d 1214 (emphasis added) (citations omitted). For claim preclusion to apply, three requirements must be met:
First, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or must be one that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the merits.
Id. at ¶ 20, 16 P.3d 1214 (quoting Madsen v. Borthick, 769 P.2d 245, 247 (Utah 1988)). We address each of these requirements in turn as they pertain to the facts in this case.

A. Are Defendants Privies of MBI?
¶ 20 "The legal definition of a person in privity with another, is a person so identified in interest with another that he represents the same legal right." Searle Bros. v. Searle, 588 P.2d 689, 691 (Utah 1978). Thus, "privity depends mostly [on the parties'] relationship to the subject matter of the litigation." Missouri Mexican Prods., Inc. v. Dunafon, 873 S.W.2d 282, 286 (Mo.Ct. App.1994). Following this rationale, final adjudication of plaintiff's claims bars subsequent litigation concerning the same subject matter against officers or owners of a closely held corporation, partners, co-conspirators, agents, alter egos or other parties with similar legal interests. See Lesser v. Gray, 236 U.S. 70, 74, 35 S.Ct. 227, 59 L.Ed. 471 (1915) (disallowance of a bankruptcy claim against bankrupt partnership was res judicata in subsequent lawsuit against individual partner); see also Alman v. Danin, 801 F.2d 1, 4 (1st Cir.1986) (holding individual defendants, who were alter egos of corporation, liable based on privity and judgment against corporation); Circle v. Jim Walter Homes, Inc., 654 F.2d 688, 692 (10th Cir.1981) (stating that subsidiary in privity with parent and sister corporation); Hellman v. Hoenig, 989 F.Supp. 532, 536-38 (S.D.N.Y.1998) (holding that privity exists between corporate defendant and officers and directors).
¶ 21 It is undisputed that the corporate defendants in this case are affiliates, subsidiaries, or parent companies of MBI, that Kalenuik, Bolduc, and Jurak own and direct all the Matol entities, and that Garrett organized MCC. Thus, the corporate defendants are sister corporations of MBI and the individual defendants are principals, officers and employees of MBI. In these respective capacities, defendants defended MBI in the C-36 proceeding. In addition, the causes of action in this case stem from the same alleged conduct, obligations, and legal theory as the claims against MBI in the C-36 proceeding. Thus, defendants' legal rights and interests are identical with those of MBI, meeting the legal definition of a person in privity with another as set forth in Searle Brothers.
¶ 22 In addition, Press has argued throughout this litigation that defendants are "so identified in interest" with each other that their "legal rights" have no "separate legal existence." In fact, in its brief to this court, Press admits that "[d]efendants' joint liability . . . is based, in part, on a corporate disregard and piercing the corporate veil theory that the three individual owners operated all of the various Matol entities as a partnership, creating new corporations and changing their cash flow at will." Thus, Press's attempt to retract its previous allegations of privity in an effort to prevent dismissal of this case seems disingenuous at best. See Futura Dev. Corp. v. Centex Corp., 761 F.2d 33, 43-44 (1st Cir.1985) (stating that plaintiff "cannot . . . claim liability on the basis of an alter ego theory while at the same time denying that the defendants have sufficient identity of interest"). Based on the foregoing, we conclude the district court's determination of privity in this case is correct, and agree that given the circumstances, "[p]laintiff is precluded from claiming that [d]efendants are not in privity with one another."

B. Were the Claims in This Case Presented in the C-36 Proceeding?
¶ 23 According to the Protocol between the C-36 Court and the Bankruptcy Court, timely filings in either proceeding would be deemed filed in both proceedings. Press filed a timely notice of claim in the Bankruptcy Court proffering the entire record in this case as its evidence. Thus, the interim manager reviewed the entire record in this case. Essentially, the claims submitted in the C-36 proceeding were legally and *1129 factually identical to the claims asserted in this litigation; they espouse the same theories, elements, and factual determinations. This is particularly true in light of the fact that the notice of disallowance addresses all of Press's claims in this case. In fact, the interim manager's rationale for disallowing Press's claims in the C-36 proceeding is similar to the basis used by the district court in granting defendants' motions for summary judgment. Therefore, the district court properly held that Press's claims in this case were raised in the C-36 proceeding.

C. Does the Notice of Disallowance Constitute a Final Judgment on the Merits?
¶ 24 Under Utah case law, "[a]n arrangement confirmed by a bankruptcy court has the effect of a judgment entered by a federal district court . . . [and] is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition." Copper State Thrift & Loan, 735 P.2d at 390 (citations omitted). Here, upon receipt of the notice of disallowance, Press sought to have its claims reviewed by the Bankruptcy Court, arguing among other things, that the Canadian court lacked jurisdiction.[12] The Bankruptcy Court refused Press's request. On the contrary, it granted MBI's Motion to Convert, approved the Third Plan of Arrangement, and granted MBI's request for injunctive relief, essentially affirming the notice of disallowance. Nevertheless, it did allow Press an opportunity to appeal the disallowance before the C-36 Court. Press chose not to pursue its appeal of right in the C-36 proceeding. Rather, it sought review of the Bankruptcy Court's ruling. The U.S. District Court of Nevada affirmed the ruling of the Bankruptcy Court, holding that the Bankruptcy Court had the authority to approve the Third Plan of Arrangement and to enjoin the state proceedings pursuant to 11 U.S.C. § 304(b) and (c)(3), and concluding that "Press cannot show particularized harm if compelled to litigate in Canada." Given that the judgment of the Bankruptcy Court was upheld on appeal, there is no question as to its finality. Thus, the district court was correct in concluding that the adjudication of Press's claims in the C-36 proceeding was a final judgment on the merits.[13]

CONCLUSION
¶ 26 The requirements for claim preclusion were met in this case. Thus, the district court properly barred Press's claims against the remaining defendants under the doctrine of res judicata. Given our holding on this question, the remaining issue on appeal is moot. Affirmed.
¶ 27 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURRANT, and Judge JACKSON concur in Justice DURHAM'S opinion.
¶ 29 Having disqualified himself, Justice WILKINS does not participate herein; Judge NORMAN JACKSON from the Court of Appeals sat.
NOTES
[1] It is undisputed that Probe International, an independent subcontractor of Press, created for MBI earlier versions of some of the promotional materials Press claims to have modified for MBI.
[2] These included a license agreement, a non-disclosure agreement, a consulting agreement, and a transition agreement.
[3] MBI's claims were voluntarily withdrawn, and only Press's counterclaim remained. The counterclaim named the following defendants: Matol Botanical International, Ltd. (MBI), Matol Communications Corporation (MCC), Matol Partners America, Inc., Matol Partners Corporation (MPC), Sam Kalenuik, Robert Bolduc, Anthony Jurak, Kevin D. Olsen, and Gerald Garrett. The corporate defendants are affiliates, subsidiaries, or parent companies of MBI. With respect to the individual defendants, Kalenuik, Bolduc and Jurak own the Matol entities. Kalenuik is Vice President of MBI and MPC, Bolduc is President of MPC, and Jurak is the Secretary/Treasurer of both. Olsen is the Chief Operating Officer of MBI, and Garret is a Utah resident who organized MCC. On August 6, 1996, Olsen was dismissed from this case pursuant to a stipulation. Later, in September 1997, the district court held that Press failed to provide any evidence to sustain claims against Garrett. Nevertheless, it denied Garrett's motion for summary judgment with respect to the first, seventh, eighth, and sixteenth claims. See infra n. 4.
[4] We note that numerous motions were filed below, including several motions for summary judgment. However, we have designated the motions which are the subject of this appeal "first motion for summary judgment" and "second motion for summary judgment" for the sake of clarity.
[5] We note that in January 1995, Press filed its fourth amended counterclaim adding breach of trade customs as its seventh claim and changing breach of fiduciary duty to its ninth claim, thus, MBI's first motion for summary judgment did not apply to these. The fourth amended counterclaim sets forth the following claims: (1) breach of license agreement, (2) breach of non-disclosure agreement, (3) breach of consulting agreement, (4) breach of transition agreement, (5) breach of implied covenant of good faith and fair dealing, (6) breach of contract, (7) breach of trade customs, (8) misappropriation or conversion of proprietary property and work-product, (9) breach of fiduciary duty, (10) wrongful interference with business relationship, (11) interference with prospective business, (12) tortious interference with contract, (13) antitrust violations, (14) injunction, (15) unfair methods of competition under section 13-5-2.5 of the Utah Code, (16) unfair competition under common law, (17) accounting, and (18) attorney's fees.
[6] In C-36 proceedings, the reorganization is administered by an interim manager, in this case, the accounting firm of Richter & Associates, Inc.
[7] In American bankruptcy proceedings, a court appointed trustee administers the reorganization.
[8] Pursuant to 11 U.S.C. § 304, the Bankruptcy Court required the Protocol to provide:

adequate and sufficient information to creditors in the United States . . . just treatment of all claims and holders, . . . protect[ion of] claim holders in the United States against undue prejudice and inconvenience in regards to claims processing under the C-36 proceeding,. . . the presentation and approval with a reasonable time period of a [P]lan of Arrangement under the C-36 proceeding which complies at least with the basic protection of creditors under the United States Bankruptcy Code, and. . . assure[s] the considerations of comity are recognized, as expressed by the Court.
[9] In pertinent part, 11 U.S.C. § 304(c) provides as follows:

In determining whether to grant relief . . ., the Court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with (1) just treatment of all holders of claims against or interests in such estate; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claim in such foreign proceeding[.]
[10] Our search of the record failed to locate any evidence to support this allegation.
[11] Accordingly, only claims two, five, seven, nine, twelve and sixteen remained pending.
[12] In support of this argument, Press cites paragraph 4A.9.1. of the Third Plan of Arrangement which provides that "[n]othing in this Plan of Arrangement shall be construed to subject any creditor to the personal jurisdiction of the Canadian Courts except as provided herein." However, according to paragraph 6.7 "the COMPANY or the creditor may appeal the [INTERIM MANAGER'S] decision to the COURT within ten days of receipt of written notice. . . ." Thus, under the Plan of Arrangement, clearly the C-36 Court had jurisdiction to review disallowed claims. Since 1883, the U.S. Supreme Court has held that an adverse determination in a Canadian bankruptcy proceeding is binding on plaintiffs in the United States. Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 537-38, 3 S.Ct. 363, 27 L.Ed. 1020 (1883) (explaining that "[e]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, . . . . It follows, therefore, that anything done at the legal home of the corporation, under authority of such laws, which discharges it of liability there, discharges it everywhere.").
[13] We agree with the district court that "the fact that the final decision was made by the [interim manager in the C-36 proceeding] is the result of Press's refusal to pursue [its] claims in Canada, despite court orders stating Canada was the proper forum." See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 399-401, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (holding that plaintiffs were bound by their own free, calculated, deliberate choice not to appeal).